# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **In re**<br><br>**JAMES LONG, JR.,**<br><br>                **Debtor** | **Chapter 13**<br>**Case No. 05-11312-RS** |

## MEMORANDUM OF DECISION ON
## DEBTOR'S OBJECTIONS TO CLAIMS OF MORTGAGEES
## AND MORTGAGEE'S OBJECTION TO CONFIRMATION OF PLAN

This case is before the Court on the objection of the Chapter 13 Debtor, James Long , Jr. ("the Debtor"), to the secured claims of two mortgagees and on the objection of the first-position mortgagee to confirmation of the Debtor's Chapter 13 plan.  For the reasons set forth below, the Court will overrule the Debtor's objection to the first-position mortgage claim of Matrix Financial Services and sustain his objection to the second-position mortgage claim of Portfolio Resolutions Ltd.  The Court will also sustain the objection to confirmation and order the Debtor to file an amended plan that makes provision for the allowed secured claim of Matrix Financial Services.

## PROCEDURAL HISTORY

### a.  Chapter 13 Plan

The Debtor filed a petition for relief under Chapter 13 of the Bankruptcy Code on February 28, 2005, thereby commencing the present case.[1]  On the same day, he filed a Chapter 13 plan.  The plan proposed to pay only one claim, a priority claim in favor of the Town of

---

[1]This was not his first bankruptcy filing.  In this same court, he filed a petition for relief under Chapter 13 of the Bankruptcy Code on April 10, 1997, thereby commencing case No. 97-13364.  On motion of the Chapter 13 Trustee to dismiss for inability of the Debtor to fund the confirmed plan, the case was dismissed on April 26, 2002.

Lexington, Massachusetts, which claim the plan quantified at $1,620.00. The plan also indicated that general unsecured creditors are owed a total of $14,027.92, but it proposed to pay no dividend on their claims. The plan made no mention of secured creditors and made no provision for payment of their claims. The total cost of the plan, including the Chapter 13 Trustee's fee, was $1,800. The plan provided for payment of this sum by 12 monthly payments of $150.00.

Dovenmuehle Mortgage Company, LLP, filed the only objection to the plan. Dovenmuehle objected to the plan on the basis that the plan does not make provision for curing the prepetition arrearage on its mortgage claim, which arrearage Dovenmuehle quantified at $269,280.89. Dovenmuehle also complained that the plan, though a "sale plan,"[2] did not specify a sale date and did not make provision for postpetition payments prior to the sale, and that it left Dovenmuehle inadequately protected. The Debtor filed a response to Dovenmuehle's objection to the plan, stating only that he disputed Dovenmuehle's quantification of the mortgage arrearage and would file an objection to Dovenmuehle's proof of claim.

Later, on November 15, 2005, Dovenmuehle withdrew its proof of claim, explaining that Dovenmuehle had filed the claim as servicer of the mortgage for its current holder, Matrix Capital Bank, and, as Matrix had filed a claim of its own in the case, the claim of Dovenmuehle was duplicative.[3] Still, Dovenmuehle has not withdrawn its objection to the plan but continues

---

[2]Dovenmuehle characterizes the plan as a sale plan but does not indicate why. The plan makes no mention of a sale of property.

[3]On May 9, 2005, a proof of claim was filed in the name of Matrix Financial Services, not Matrix Capital Bank. Despite this discrepancy, no one disputes that the claim of Matrix Financial Services ("Matrix") is the claim to which Dovenmuehle was referring. Dovenmuehle and Matrix have been represented in this case by the same counsel.
The Dovenmuehle and Matrix proofs of claim, though substantially similar, differ with regard to the amount of the claim and the amount of the arrearage. Dovenmuehle quantifies the claim at $356,536.76, Matrix at $359,463.43; Dovenmuehle quantifies the arrearage at $269,280.89, Matrix at $264,122.10.

to prosecute it through Matrix's counsel (the same attorney as represented Dovenmuehle in this case); all parties have treated Dovenmuehle's objection as, in essence, an objection by Matrix, the interests of Dovenmuehle and Matrix in this case being virtually identical.

On July 28, 2005, after a hearing on a motion by the Chapter 13 Trustee to dismiss this case, the Court ordered the Debtor to file an amended plan. The Debtor, now acting pro se,[4] filed a new plan on August 4, 2005. Entitled "Proposed Real Estate Sale Plan," the plan is brief and lacking in many essentials. In its entirety, it reads:

> I, Debtor James Long, Jr. propose a real estate plan for 149 Adams Street, Lexington, Ma. to satisfy outstanding property debts, if any, after current issues of numerical disputes and other business practices have been resolved.
>
> Details of the plan will be presented and based on the true and accurate numbers as are expected to be pursued and established by this court.
>
> I propose further, that the real estate portion of my Chapter 13 filing be handled separate from other debts I have incurred in order to avoid confusion.
>
> For non-secured Creditors, Debtor proposes to pay $150.00 per month to the Trustee to repay creditors.

On March 10, 2006, the Chapter 13 Trustee filed a second motion to dismiss this case, on the basis that the Debtor had not made a plan payment since June 2005 (which is to say, he has not made even one plan payment), and the plan was to expire by its own terms in March 2006. After a hearing on this motion, the Court, on May 18, 2006, ordered the Debtor to file and serve a further amended plan.

The Debtor, still acting pro se, filed a second amended plan on June 19, 2006. This

---

[4]The Debtor was represented by counsel when this case was commenced, but counsel withdrew early in the case. The Debtor has been acting pro se since then. He has been acting pro se in conjunction with all aspects of the litigation of the matters presently before the court.

second amended plan, like the one before it, does not make definite provision for payment of

secured claims.  Under the heading of "Secured Claims to Be Paid Through the Plan," the plan

lists two claims: one in favor of "Bank Five/FNMA Dovenmuehle" (this is the Matrix mortgage

claim[5]) and another in favor or Portfolio Solutions (who purports to be the second mortgagee).

As to both, the proposed treatment is: "$00.00 pending outcome of issue before the Bankruptcy

Court," by which the Debtor means resolution of his pending objections to the claims of Matrix

and Portfolio Solutions, which objections are the subject of this memorandum of decision.

The plan also proposes to pay in full a priority claim for federal taxes in the amount of

$9,526.11 and general unsecured claims now quantified at $2,781.33.  In order to pay these

claims, the Debtor proposes to make payments of $150 per month "until issues pending are

determined."  The term of the plan is extended to 24 months.  The plan offers no indication as to

how the balance of the plan distributions would be funded, as 24 payments of $150 will not fund

even the payments on priority and unsecured debt outlined in this paragraph.  This second

amended plan has not been adjudicated and remains pending.


### b.  Proof of Claim of Matrix Financial Services and Debtor's Objection Thereto

On May 9, 2005, Matrix Financial Services filed a proof of claim, asserting a secured

claim in the amount of $359,463.43.  The claim is secured by a first mortgage on the Debtor's

residence, the real property at 149 Adams Street, Lexington, Massachusetts.  The proof of claim

quantified the prepetition arrearage on the mortgage loan at $264,122.10, including (according to

an itemization attached to the proof of claim) 91 monthly payments of $2,610.28.

---

[5]Bank Five for Savings and the Federal National Mortgage Association were former
holders of the mortgage; Dovenmuehle serviced the mortgage for Matrix.

On June 1, 2005, the Debtor filed an objection to Matrix's proof of claim, entitled, "Objection to the Matrix Proof of Claim and Objection to the Objection of Matrix to Debtor's Plan, and Objection to Any Claim that Debtor Owes Matrix any Monies."  The Debtor contends that he does not owe any money to Matrix.  The bases for this contention, while not entirely clear, appear to be as follows.

First, the Debtor questions whether Matrix is in fact the present holder of the note and mortgage in question.  The note and mortgage were originally given by the Debtor and his wife to Bank Five for Savings and since then have changed hands repeatedly.

Second, the Debtor complains that his troubles with this loan commenced when an earlier holder of the loan demanded that the Debtor pay his real estate taxes through an escrow account with the mortgagee, instead of directly to the taxing authority, the Town of Lexington.  This demand apparently caused the Debtor to default on the loan—he contends he was not then in default on his principal and interest obligations—whereupon the holder of the mortgage commenced foreclosure proceedings.[6]  He contends that this demand imposed an unfair, illegal, and unconstitutional obligation to pay his property taxes twice in order to avoid foreclosure.  (It appears that, when this demand was made, he and his wife substantially stopped making payments on this mortgage debt, because the mortgagee was insisting that the payment include escrowed taxes.)  He says elsewhere[7] that he refused to pay escrowed taxes to Matrix's

---

[6]He contends elsewhere that the original foreclosure complaint was filed on January 9, 1997.

[7]See the Debtor's *Dispute of the Proof of Claim and a Response/Objection to the Objection and Opposition of FNMA (Fannie Mae) as filed by Dovenmuehle Mortgage Company to the Chapter 13 Plan of James Long, Jr., Debtor* (Doc. #27), filed June 2, 2006.  Insofar as the Dovenmuehle claim was predicated on the same mortgage as is now asserted by Matrix, the Debtor's objection to the withdrawn Dovenmuehle claim elucidates his objection to Matrix's claim.  The gravamen of the Debtor's objection to the Matrix claim is substantially the same as

5

predecessor in interest (but never refused to pay principal and interest).  He contends that he is not responsible for fees, fines, late fees, or attorney's fees that have accrued since Matrix's predecessor in interest demanded that tax payments be escrowed.

Third, he contends that Matrix and its predecessors in interest are and have been engaged in a predatory lending scheme and unscrupulous and unfair business practices, by which they are trying to gain control of Debtor's residence, the real property subject to their mortgage.  The basis for this allegation, though not clear, appears to be the allegations summarized in the previous paragraphs. No other basis has been articulated.

Fourth, the Debtor contends that the amount of the claim is inflated.  Again, the Debtor does not specify how the claim is inflated or precisely which components should be disallowed or why.  The Court construes this contention as related to the mortgagee's demand to escrow taxes, and therefore as a challenge to the components of the claim that arise from that demand. These include the portion of each monthly payment attributable to the obligation to pay taxes in escrow—he contends that the monthly payment, shorn of the property tax component thereof, should be $1,889.52, not $2,610.28—and any late fees, attorney's fees, and foreclosure costs arising from his nonpayment of the tax escrow payments.

### c. Proof of Claim of Portfolio Resolutions Ltd. and Debtor's Objection Thereto

On May 17, 2006, the Portfolio Resolutions Ltd. ("Portfolio") filed a proof of claim, asserting a secured claim in the amount of $584,402.36, including an arrearage in the amount of $439,026.24.  The claim, as of the date of the bankruptcy filing, includes principal in the amount of $152,084.50, plus interest thereon since January1990 at the rate of 17.5 percent per annum,

---

his objection to the Dovenmuehle claim.

for total interest of approximately $403,523.78, plus approximately $27,000 in attorney's fees and other charges.  The claim is secured by a second mortgage on the Debtor's residence.

On June 7, 2005, the Debtor filed an objection to Portfolio's proof of claim.  In the objection, the Debtor disputed owing any monies to Portfolio and stated that Portfolio "has no legitimate claim to the property" and "no legal right to file a proof of claim."  The objection does not specify the basis of these contentions.  However, the objection states that one of Portfolio's predecessors in interest, an earlier holder of the mortgage, filed for bankruptcy itself, whereupon, for four years, the assignee or holder of the mortgage did not contact the Debtor.

On July 11, 2005, Portfolio filed a response to the Debtor's objection, saying that the issue raised by the Debtor's objection[8] has already been resolved by the bankruptcy court in the Debtor's previous Chapter 13 case.  According to Portfolio, the court (by Judge Carol Kenner) ruled in that case that an entity known as Resolution GGF OY was the valid holder of the mortgage in question, the mortgage originally executed in favor of Astrum Funding Corporation.  Portfolio states that it holds the mortgage under a subsequent assignment from Resolution GGF OY to Portfolio.

On September 19, 2005, the Debtor filed a "Rebuttal" to Portfolio's Proof of Claim.  The Rebuttal states that the proof of claim is without merit and excessive.  It explains that the Debtor entered into its second mortgage contract with Astrum Funding in 1988, that the principal amount of the loan was $150,000, with interest at the "astronomical" rate of eighteen percent, and that the Debtor has not entered into a contractual relationship with Portfolio.

In the Rebuttal, the Debtor articulates the following grounds of objection to the Portfolio claim.  First, the Debtor contends that Portfolio's contractual claim is invalid because Portfolio

---

[8]Portfolio does not specify what it understands that issue to be.

7

paid insufficient value—only ten dollars—for the note and mortgage.  Ten dollars, contends the

Debtor, "is not sufficient consideration to lay claim to a $1.2 million dollar property as a

protected party without a negotiated contract between Debtor and Portfolio."

Second, the Debtor points out that he has no contractual relationship with Portfolio.  His

mortgage contract is with Astrum Funding.

Third, the Debtor complains that Astrum and its successors and assigns have not

adequately documented and recorded the chain of title with respect to the note and mortgage.

The Debtor thus questions whether Portfolio does in fact currently own the note and mortgage.

Fourth, the Debtor contends that he has been prejudiced by the failure of Astrum and its

successors in interest to timely and properly inform him as to changes in ownership of the note

and mortgage and changes in payment obligations as to the note.  He complains especially,

though not exclusively, of a long period after Astrum Funding went out of business, during

which period he was given no information by Astrum, its successors, or anyone else as to the

status and ownership of his loan.  The Debtor does not specify precisely how he was prejudiced

by these omissions, but he contends that they render the loan agreement invalid.

Fifth, the Debtor contends that Portfolio overstates the scope of Judge Kenner's ruling on

Portfolio's mortgage in the earlier case.  He does not explain precisely what Judge Kenner ruled

and how Portfolio overstates that ruling.

### d.  Preliminary Hearing

On October 6, 2005, the Court held a preliminary hearing on the Debtor's objections to

the claims of Matrix and Portfolio and on the Dovenmuehle objection to the Debtor's plan.  At

the hearing, the Debtor elaborated on his objection to the Matrix proof of claim.  He also

clarified that he hoped and intended that the Court would first determine what he owes on the

mortgage claims, and that he would then begin marketing the property and would file a detailed

Chapter 13 plan that would involve a sale of the mortgaged property.

The Debtor also elaborated upon his objection to the claim of Portfolio. He stated that

the $10 consideration paid by Portfolio for the note and mortgage is insufficient consideration,

and that "many statutes do not protect a subsequent lien creditors where insufficient

consideration has been paid." He did not specify the "many statutes" to which he was referring

or explain how they bear upon the validity of Portfolio's secured claim.

The Debtor's wife, Patricia Long, was also allowed to speak at the hearing.[9] She made

two points. First, with respect to the first-position mortgage, she stated that in 1992, after the

original mortgagee (Bank Five for Savings) went out of business, she and the Debtor entered into

a new mortgage contract with the liquidating agent for Bank Five for Savings, and it is this 1992

contract which controls. Under this contract, she stated, the monthly payment is $1,889.52, not

$2,667.00 (as Matrix contends). Second, with respect to the Portfolio mortgage, she stated that

she did not see how Portfolio, by paying $10 for the mortgage loan, had a right to charge them

on it, especially where Portfolio didn't contact her and her husband and didn't pay value, and the

underlying contract was faulty (she did not explain how or why).

At the close of the preliminary hearing, the Court stated that it would schedule an

evidentiary hearing on the Debtor's objections to the Matrix and Portfolio claims and defer

consideration of the Chapter 13 plan until resolution of the claims. The Court held an

---

[9]Patricia Long is a co-obligor and co-mortgagor with respect to both notes and
mortgages. She also resides in the mortgaged property with her husband. Nonetheless, she
appears to have made her statement at the hearing as an advocate for the interests of her husband.
She is not a joint debtor in this bankruptcy case and has not otherwise appeared in the case.

evidentiary hearing on the Debtor's objections to the claims of Matrix and Portfolio on

November 16, 2005.


**FINDINGS OF FACT**

    **a. The Matrix Loan**

    On July 31, 1986, James Long, Jr. and his wife, Patricia Long, gave to Bank Five for

Savings an adjustable-rate promissory note in the principal amount of $175,000.  On that same

date, to secure their obligation on the note, they gave to Bank Five for Savings a mortgage on

their residence, the real property located at 149 Adams Street in Lexington, Massachusetts.

Under this note, the interest rate would vary annually, as would the monthly payment required

by the note.  The mortgage contained certain covenants, the second of which provided as

follows:

> **2. Funds for Taxes and Insurance.**  Subject to applicable law or
> to a written waiver by Lender, Borrower shall pay to Lender on the
> day monthly payments are due under the Note, until the Note is
> paid in full, a sum ("Funds") equal to one-twelfth of:  (a) yearly
> taxes and assessment which may attain priority over the Security
> Instrument [the mortgage]. . . .  Lender shall apply the Funds to
> pay the escrow items.

The seventh covenant added the following:

> **7. Protection of Lender's Rights in the Property; Mortgage
> Insurance.**  If Borrower fails to perform the covenants and
> agreements contained in this Security Instrument, or there is a
> legal proceeding that may significantly affect the Lender's rights
> in the Property . . . then Lender may do and pay for whatever is
> necessary to protect the value of the Property and Lender's rights
> in the Property.  Lender's actions may include paying any sums
> secured by a lien which has priority over this Security Instrument.
> . . .  Any amounts disbursed by Lender under this paragraph 7 shall
> become additional debt of Borrower secured by this Security
> Instrument.

By 1992, the Longs had developed a considerable arrearage on their mortgage debt.  In the meantime, Bank Five for Savings had failed and been taken over by the Federal Deposit Insurance Corporation ("FDIC").  On April 1, 1992, the Longs entered into an Amended and Restated Adjustable Rate Note with the FDIC, acting in its capacity as liquidating agent for Bank Five for Savings ("Amended Note"), in which the Longs promised to repay the increased principal amount of $229,285.13.  This transaction "cured" the arrearage by adding it to the principal amount of the loan.  To secure this amended and restated note, the Longs gave to the FDIC,  as liquidating agent for Bank Five for Savings, an Amendment to Mortgage.  Under the Amended Note, as under the original, the interest rate would vary from year to year.  The Amended Note stated that the amount of the borrowers' initial monthly payments would be $2,088.62.  The Amendment to Mortgage stated that, except as set forth therein, "the mortgage shall remain unaltered, ratified, confirmed and in full force and effect."  The Amendment to Mortgage nowhere purports to modify the second covenant in the mortgage and the borrowers obligation thereunder to escrow tax payments.

Next the note and mortgage changed hands four times.  First, on May 3, 1994, the FDIC, as liquidating agent for Bank Five for Savings, assigned the mortgage and note to Treasury Bank, Ltd.  Second, on November 18, 1994, Treasury Bank, Ltd. assigned the note and mortgage to Dona Ana Savings Bank, F.S.B.  Third, on July 17, 1995, Dona Ana Savings Bank, F.S.B. assigned the note and mortgage to New America Financial, Inc. ("New America").  And fourth, on July 19, 1995, New America Financial, Inc. assigned the note and mortgage to Harbor Financial Mortgage Corporation.

On February 1, 1996, the Longs entered into an agreement with New America that

purported to modify their obligations under the note.[10]  The agreement was entitled "Loan

Modification Agreement (Providing for Fixed Interest Rate)."  It stated that the unpaid principal

balance as of that date was $204,786.63, and that the interest rate thenceforth over the remaining

term of the note would be fixed at the yearly rate of 7.75 percent and would no longer be

adjustable.  The Loan Modification Agreement expressly fixed the amount of the borrowers'

monthly payments of principal and interest at $1,889.52.[11]  The Loan Modification Agreement

also stated:

> The Borrower also will comply with all other covenants,
> agreements, and requirements of the Security Instrument [the
> mortgage], including without limitation, the Borrower's covenants
> and agreements to make all payments of taxes, insurance
> premiums, assessments, escrow items, impounds, and all other
> payment that the Borrower is obligated to make under the Security
> Instrument.[12]

The Loan Modification Agreement thus expressly *did not* alter the borrowers' obligation under

the mortgage covenants to escrow tax payments.

By an assignment dated July 18, 1999, Harbor Financial Mortgage Corporation assigned

---

[10]The Court received no evidence or explanation as to why New America had authority to
enter into this Loan Modification Agreement when New America had transferred its interests in
the underlying note and mortgage to another entity, Harbor Financial Mortgage Corporation,
some six months earlier.  If New America had authority to modify the loan at the time of the
Loan Modification Agreement, the basis for that authority is not in evidence.  (To be clear,
neither has it been established that New America did not have authority to act for Harbor
Financial.)  Neither Matrix nor the Debtor appears to be aware that there is anything here
needing explanation.  Both assume that the Loan Modification Agreement is binding and
effective as against Matrix.  In view of their agreement on the issue, the Court will treat the Loan
Modification Agreement as binding upon Matrix.

[11]See paragraph 2 of the Loan Modification Agreement: "The Borrower promises to make
monthly payments of principal and interest of U.S. $1,889.52 . . . ."

[12]Loan Modification Agreement, ¶ 4.

its interest in the note and mortgage to Matrix Capital Bank.[13]  Through the date of the

evidentiary hearing, Matrix has not assigned or otherwise transferred its interest in the note and

mortgage.

Mr. Long contends that, at least since he and his wife entered into the 1996 Loan

Modification Agreement, his monthly payment obligation has been limited by that Loan

Modification Agreement to payment of principal and interest in the total amount of $1,889.52,

and that they have had no obligation under the note and mortgage, as amended, to pay any

additional amount for purposes of funding real estate tax payments through an escrow account

administered by the mortgagee.  He has introduced no evidence whatsoever that Matrix or any of

its predecessors in interest has waived the mortgagee's right under the second mortgage

covenant to require that the monthly payment include such additional amount as is necessary to

fund the payment of the borrowers' real estate taxes through such an escrow arrangement.  The

Loan Modification Agreement quantifies and fixes the principal and interest component of the

borrowers' monthly payment at $1,889.52, but it nowhere waives or abrogates their obligation

under the second mortgage covenant to, in addition, pay funds into escrow for payment by the

mortgagee of real estate taxes.  To the contrary, the Loan Modification Agreement expressly

preserved that obligation.

Mr. Long has also alleged that Matrix or its predecessor in interest, Harbor Financial, has

refused payments in the amount of $1,889.52 that he and his wife have tendered on the loan.  Mr.

Long, however, has not submitted evidence in support of this allegation.  Nor has he specified, in

his allegations, how often payments were refused, when these payments were tendered, and the

---

[13]On January 3, 2003, Harbor Financial executed a second assignment to Matrix Capital
Bank.  The second assignment is Exhibit E-6.  The purpose of the second is unclear.  The Debtor
does not contend that either is defective or ineffective.

circumstances in which the alleged refusal occurred (such as whether the loan was then in foreclosure).

Matrix has introduced an accounting of the history of the Longs' mortgage that dates back to the Loan Modification Agreement of February 1, 1996. Mr. Long has submitted no evidence to controvert the accounting in any material respect.[14] He does contend that he tendered some payments of principal and interest that Matrix refused to accept, but he does not contend that any accepted payment is not reflected in the accounting. Because he contends that Matrix and its predecessor in interest, Harbor Financial, were in the wrong in insisting that his monthly payments should include a tax escrow component, he disputes the propriety of Matrix's having assessed late charges, attorney's fees, tax advances, and foreclosure costs that accrued as a consequence of his and his wife failure or refusal to pay more than simple principal and interest. However, he does not deny that, if Matrix and its predecessor in interest were in the right on that issue, the charges appearing on the accounting are valid. The Court therefore credits the accounting as an accurate reflection of activity on the Longs' mortgage account and of amounts owing thereon.

The accounting commences as of the date of the February 1, 1996 Loan Modification Agreement, in which (to reiterate) New America and the Longs agreed that the principal balance as of that date was $204,786.63 and that the interest rate thenceforth over the remaining term of the note would be fixed at the yearly rate of 7.75 percent.[15] The accounting shows that the principal balance was $194,634.22 as of the date of Mr. Long's bankruptcy filing, May 9, 2005. It further shows that the oldest payment owing is the one that was due on August 1, 1997. That

---

[14]Mr. Long has submitted no evidence as to any specific debit or credit on his account.

[15]The accounting is Exhibit F.

14

is to say, as of the date of Mr. Long's bankruptcy filing, the borrowers had made all payments

due through July 1, 1997 and were ninety-four monthly payments in arrears (ninety-four monthly

payments having come due from 8/1/97 through 5/1/05).[16]  Interest at 7.75 percent per annum on

the principal balance of $194,634.22 over ninety-four months totals $118,159.19.

In addition to principal and interest, the debt includes four additional components:

unreimbursed escrow advances, late charges, prior bankruptcy fees and costs, and foreclosure

fees and costs.  The accounting shows a negative escrow balance—representing advances by the

mortgagee for escrow items for which the mortgagee has not been reimbursed by the

borrowers—as of May 9, 2005 of $19,081.92.  An itemization attached to the proof of claim and

introduced into evidence at the hearing shows that the debt includes 75 late charges at $56.69

each, for total late charges of $4,251.75, plus bankruptcy fees and costs of $1,250.00

(attributable to the Debtor's prior bankruptcy, not the present) and foreclosure fees and costs of

$21,047.20.  Therefore, the total debt, as of the date of the bankruptcy filing, is $358,424.28,

itemized as follows:

| Principal | $ | 194,634.22 |
|---|---|---|
| Interest | $ | 118,159.19 |
| Late Charges | $ | 4,251.75 |
| Bankruptcy Fees and Costs | $ | 1,250.00 |
| Foreclosure Fees and Costs | $ | 21,047.20 |
| Unreimbursed Escrow Advances | $ | 19,081.92 |
| Total | $ | 358,424.28 |

---

[16]This also means the Longs have made only 17 monthly payments since their February
1, 1996 Loan Modification Agreement, the first payment on which was due March 1, 1996.  The
Longs were current on their mortgage debt as of the date of the Loan Modification Agreement.

**b.  The Portfolio Loan**

On December 9, 1988, the Debtor and his wife borrowed $153,000 from a lender known as Astrum Funding Corporation ("Astrum").  In exchange for the loan, the borrowers gave Astrum a promissory note, entitled Note for Subordinate Mortgage Loan.  The note required payment of interest by the borrowers at the fixed rate of seventeen and one-half (17.5) percent per annum and monthly payments of principal and interest in the amount of $2,409.10.  The note had a term of 15 years, the last payment (including the full balance then owing) having come due on January 1, 2004.  To secure the note, the borrowers gave Astrum a mortgage on their residence, the real property located at 149 Adams Street in Lexington, Massachusetts, which mortgage was second in priority to the mortgage originally given to Bank Five for Savings.

On December 30, 1992, Astrum assigned to Union Mortgage Company, Inc. ("Union") its mortgage on the Longs' residence and the note and claim secured thereby.  The assignment is memorialized in a writing that is in evidence as the sixth page of Portfolio's Exhibit B.

Portfolio contends that it holds the mortgage and note by virtue of a further assignment, in April 2002, from Union to Portfolio, as memorialized in a writing that was introduced into evidence as the seventh page of Portfolio's Exhibit B.  The writing contains words of conveyance from Union to Portfolio:

> Union Mortgage Company, Inc. . . . has Sold, Transferred and Conveyed, and does hereby Sell, Transfer and Convey unto said Portfolio Resolutions, Ltd. . . . the said Note and said lien and all liens and titles held by it in and to said land.

The writing, however, is not signed by Union itself.  The signature portion of the document reads as follows:

> In witness whereof, the said Corporation [Union Mortgage Company, Inc.] has caused these presents to be signed by its duly authorized officers and to be sealed with the Seal of the

16

Corporation, at Dallas, Texas.

this 30TH day of April, A.D. 2002.

Attest: FOREMOST SERVICING COMPANY,
INC., BY POWER OF ATTORNEY FOR
RESOLUTION GGF OY, SUCCESSOR IN
INTEREST TO UNION MORTGAGE
COMPANY, INC.

 *Paul Madere*   
 Paul Madere/Vice-president

The writing is signed by a Paul Madere in his capacity as vice-president of Foremost Servicing

Company, Inc. ("Foremost").  Foremost, in turn, purports to be acting as attorney-in-fact for an

entity known as Resolution GGF OY.  The writing is thus, in effect, signed by Resolution GGF

OY.  And in signing the document, Resolution GGF OY purports to be exercising rights that

(according to the last clause in the signature block) it claims to hold as successor in interest to

Union.  Portfolio has submitted no evidence either identifying Resolution GGF OY or

establishing that or how Resolution GGF OY came to be successor in interest to Union with

respect to the Longs' note and mortgage.  Nor has Portfolio submitted evidence that Foremost

Servicing Company, Inc., held a power of attorney for Resolution GGF OY.[17]

 In order to establish that Resolution GGF OY was the valid holder of the mortgage in

question (prior to assignment from Resolution GGF OY to Portfolio), Portfolio has repeatedly

---

[17]Portfolio's presentation of evidence was exceedingly thin.  The only witness to testify
for Portfolio was a Paul Madere, president of Foremost Servicing Company.  (Foremost services
loans for Portfolio; Madere did not indicate whether the Long's loan is one that Foremost has
serviced for Portfolio.)  No testimony was adduced as to whether he is the same Paul Madere as
signed the assignment from Resolution GGF OY to Portfolio.  In any event, no testimony was
elicited from him concerning the execution of the assignment, the authority of Foremost to act
for Resolution GGF OY, or the relation of Resolution GGF OY to Union Mortgage Company.
The record contains no indication that he has personal knowledge or memory of those events and
circumstances or of the alleged acquisition of the mortgage in question by Portfolio.

made reference to a ruling made by Bankruptcy Judge Carol J. Kenner in the Debtor's previous

bankruptcy case.  However, Portfolio has not introduced into evidence the ruling in question or

the memorandum or order in which it was set forth.  Nor has it adduced evidence of the

pleadings that gave rise to the ruling, the docket of the earlier case, or any memorandum of the

Judge's findings and rulings in the matter; nor has it asked the Court to take judicial notice of

any of these.[18]

 Each of the assignments of the second mortgage—from Astrum to Union, and then from

Union to Portfolio—states that the assignment was made "for and in consideration of the sum of

ten and no/100 ($10.00) Dollars and other good and valuable considerations."  The Debtor cites

this language as evidence that the consideration paid by each assignee for the note and mortgage

was limited to $10.00.  The Court disagrees and finds that the quoted language is not credible

evidence of the value paid by the assignees for the loan and mortgage.  First, it does not say that

the consideration was $10.00; rather, it says the consideration was $10.00 "*and* other good and

valuable considerations."  The full extent of the consideration is not stated.  Second, the

language is evidently intended not to disclose the extent of the consideration but simply to

---

[18]Although the docket of the earlier case is readily available in the Court's electronic
database, the pertinent documents (all paper documents, not electronic) were not at that time
imaged into the same database and are presently in archives in a remote location.  Though they
are capable of retrieval, they are not at present accessible.  To the Court's knowledge, Portfolio
did not submit a request to retrieve them.

 With a response filed in the present case on July 11, 2005, Portfolio filed, as an
attachment, a page from the docket of the earlier case and highlighted an entry thereon entitled
"Memorandum of Decision on Proof of Claim of Creditor, Resolution GGF OY."  The entry
appears to include certain language excerpted from the Memorandum of Decision as follows: "I
hold that Resolution GGF OY is the present holder of the second mortgage originally executed
in favor of Astrum Funding Corporation in 1988.  The Debtor has failed to sustain his burden.  A
separate order will enter accordingly. [See Memorandum of Decision for complete text]."  This
attachment was not evidence.  Nor did Portfolio attempt to introduce it at the evidentiary
hearing.  In any event, neither the full memorandum nor the accompanying order is in evidence.

indicate that consideration was paid.  Third, the recitation is hearsay and not admissible to

establish the extent of consideration.  No evidence was submitted from which the Court could

determine the consideration paid for either assignment.

Mr. Long contends that he has been prejudiced by the failure of Astrum and its

successors in interest to timely and properly inform him of changes in ownership of the note and

mortgage and changes in payment obligations as to the note.  He complains especially of a long

period after Astrum Funding went out of business, during which period he was given no

information by Astrum, its successors, or anyone else as to the status and ownership of his loan.

In support of these allegations, the Debtor has established that Astrum went out of business in

late 1992, but he has otherwise submitted no evidence at all.  The Debtor has submitted no

evidence, even by his own testimony, that he and his wife were uninformed of changes in

ownership of the loan, or as to how he and his wife attempted to deal with and were affected or

prejudiced by this alleged lack of information.

The Debtor has submitted no evidence to controvert Portfolio's proof of claim with

respect to the amount owing on the second mortgage.  The proof of claim states that, as of the

date of the Debtor's bankruptcy filing, the amount owing was $584,402.36.  The principal

balance is $152,084.50.

**DISCUSSION**[19]

    **a. Proofs of Claim**

    The principal matters before the Court are the Debtor's objections to two proofs of claim.

A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy

Procedure constitutes prima facie evidence of the validity and amount of the claim. FED. R.

BANKR. P. 3001(f); see also *Juniper Dev. Group v. Kahn* (*In re Hemingway Transp., Inc.*), 993

F.2d 915, 925 (1st Cir.1993). In order to rebut this prima facie evidence, the objecting party

must produce "substantial evidence." *United States v. Clifford* (*In re Clifford*), 255 B.R. 258,

262 (D.Mass. 2000) (*Hemingway Transport*, 993 F.2d at 925). If the objecting party produces

substantial evidence in opposition to the proof of claim and thereby rebuts the prima facie

evidence, the burden shifts to the claimant to establish the validity of its claim. *Hemingway*

*Transport*, 993 F.2d at 925 ("Once the trustee manages the initial burden of producing

substantial evidence . . . the ultimate risk of nonpersuasion as to the allowability of the claim

resides with the party asserting the claim."). Where the proof of claim is not filed in accordance

with the Federal Rules of Bankruptcy Procedure, the proof of claim does not constitute prima

facie evidence of the validity and amount of the claim, and therefore the burden of proof rests at

all times on the claimant.

    In order for a proof of claim to be executed and filed in accordance with the Federal

Rules of Bankruptcy Procedure, it must satisfy (among other things) two requirements set forth

in Rule 3001 itself. First, "when a claim . . . is based on a writing, the original or a duplicate

shall be filed with the proof of claim." FED. R. BANKR. P. 3001(c). Second, "[i]f a security

---

[19]This case was commenced before the effective dates of the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005 and therefore, insofar as it is governed by the
Bankruptcy Code, is not affected by the modifications to the Code effected by that act.

interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected."  FED. R. BANKR. P. 3001(d).

The Matrix claim is based on several writings, including the original promissory note, the mortgage, the 1996 Loan Modification Agreement, and the various assignments by which the claim became Matrix's.  None of these was attached to or filed with Matrix's proof of claim.[20] Nor was the proof of claim accompanied by evidence that the security interest had been perfected.  For both reasons, the Court concludes that Matrix's proof of claim is not prima facie evidence of the validity and amount of the claim asserted therein.  Consequently, the Debtor bears no initial burden of rebuttal, and the burden of proof rests from the start on Matrix.

With its proof of claim, Portfolio did file copies of the promissory note, the mortgage, and the assignments on which its claim is predicated.  Portfolio's proof of claim is also accompanied by evidence that the mortgage has been perfected.[21]  For these reasons, and because the Portfolio claim shows no obvious defects in filing or execution, the Court concludes that it constitutes prima facie evidence of the claim.  Accordingly, the Debtor bears the initial burden of rebuttal.

### b.  **The Matrix Claim**

The Debtor has objected to Matrix's proof of claim on four distinct grounds.  I will address each in turn.

The Debtor first questions whether Matrix is in fact the present holder of the first-

---

[20]Nor were they attached to the related proof of claim of Dovenmuehle Mortgage Company, LLP.

[21]The assignment from Astrum Funding to Union Mortgage Company identifies the mortgage being conveyed by specifying where it was recorded.

position note and mortgage.  The note and mortgage were originally given by the Debtor and his

wife to Bank Five for Savings and since then have changed hands repeatedly.  In response to this

objection, Matrix has established a clear chain of title from Bank Five for Savings to Matrix.

The evidence shows clearly that ownership of the note and mortgage passed by regulatory action

from Bank Five for Savings to the FDIC as liquidating agent for Bank Five for Savings, then by

assignment to Treasury Bank, Ltd., then by assignment to Dona Ana Savings Bank, F.S.B., then

by assignment to New America Financial, Inc., then by assignment to Harbor Financial

Mortgage Corporation, and then, lastly, by assignment to Matrix.  The Debtor has introduced no

evidence  to the contrary.  Nor has he argued that Matrix's evidence does not establish that

Matrix is the current holder of the note and mortgage.  On the basis of the evidence adduced, the

Court concludes that Matrix is the current holder of the note and mortgage.

Second, the Debtor objects to Matrix's claim on the basis that an earlier holder of the

loan demanded, improperly, that the Debtor pay his real estate taxes through an escrow account

with the mortgagee, instead of directly to the taxing authority, the Town of Lexington.  He

contends that this demand was the root of most of his trouble with this loan, that it was a

violation of the Loan Modification Agreement insofar as that agreement fixed monthly payments

at $1,889.52, and that it was a violation of his constitutional right not to be forced to pay his

taxes twice.

The Court finds no merit in this objection.  Covenants in the mortgage clearly obligated

the Debtor to pay his taxes through an escrow arrangement with the mortgagee, permitted the

mortgagee to make such tax payments from funds in escrow, and, if there were insufficient funds

in escrow, permitted the mortgagee to pay such taxes from its own funds and to seek

reimbursement from the Debtor for such advances.  The Loan Modification Agreement fixed

22

monthly payments of principal and interest at $1,889.52, but it did not nullify or cancel the

borrowers' obligation under the mortgage covenants with respect to payment of taxes through

the mortgagee.  To the contrary, it expressly preserved that obligation.  The Loan Modification

Agreement did not limit and fix the size of the entire monthly payment; it fixed only the portions

thereof constituting principal and interest.  Nor does the escrow arrangement mandated by the

mortgage covenants obligate the Debtor to pay his real estate taxes twice.  It only obligates him

to pay those taxes through the mortgagee.  For these reasons, the Debtor's second basis of

objection must be overruled; the Debtor is entitled to no relief from or abatement of his mortgage

debt on the basis of the demand by Matrix or any of its predecessors in interest for payment of

taxes through escrow.

Third, the Debtor contends that Matrix and its predecessors in interest are and have been

engaged in a predatory lending scheme and unscrupulous and unfair business practices, by which

they have tried to gain control of the Debtor's equity in his residence.  The basis for this

allegation, insofar as it has been articulated at all, appears to be the allegations that constitute

Debtor's second objection, concerning the mortgagees' demands for payment of taxes through

escrow, as summarized in the previous paragraphs.  No other basis has been articulated., and the

Debtor has submitted no evidence whatsoever in support of this contention.  Having found no

merit in the second objection, the Court likewise finds no merit in this third basis of objection.

As his fourth and last objection to Matrix's claim, the Debtor contends that the amount of

the claim is inflated.  He does not specify how the claim is inflated or precisely which

components should be disallowed or why.  The Court construes this contention as related to the

mortgagee's demand to escrow taxes, and therefore as a challenge to the components of the

claim that arise from that demand.  These include the portion of each monthly payment

23

attributable to the obligation to pay taxes in escrow—he contends that the monthly payment,

shorn of the property tax component thereof, should be $1,889.52, not $2,610.28—and any late

fees, attorney's fees, and foreclosure costs arising from his nonpayment of the tax escrow

payments.

Having found that Matrix and its predecessor holders of this mortgage were well within

their rights in demanding that taxes be paid through the mortgagee, the Court overrules this

objection.  The Debtor has not challenged the amount of Matrix's claim except on this basis.

Therefore, the Court finds that as of the date of the Debtor's bankruptcy filing, the amount of the

debt to Matrix was $358,424.28, as substantiated by Matrix's accounting at the hearing.


### c.  <u>The Portfolio Claim</u>

As the Court explained above, Portfolio's proof of claim constitutes prima facie evidence

of the claim, and therefore the Debtor bears the initial burden of rebuttal.  The Debtor has

objected to Portfolio's claim on several grounds:  (a) that he and his wife have no contractual

relationship with Portfolio, their mortgage contract being with Astrum Funding; (b) that Astrum

and its successors and assigns have not adequately documented and recorded the chain of title

with respect to the note and mortgage, such that it is not clear whether Portfolio does in fact

currently own Astrum's rights under the note and mortgage; (c) that Portfolio overstates the

scope of Judge Kenner's ruling on Portfolio's mortgage in the earlier case; (d) that Portfolio's

contractual claim is invalid because Portfolio paid insufficient value, only ten dollars, for the

note and mortgage; and (e) that he has been prejudiced by the failure of Astrum and its

successors in interest to timely and properly inform him as to changes in ownership of the note

and mortgage and changes in payment obligations as to the note.

The Court will begin by addressing the last two objections, neither of which the Court deems to have merit.  In the first, the Debtor contends that Portfolio cannot properly assert the mortgage claim against the Debtor because Portfolio paid insufficient consideration, only ten dollars, for the rights of Astrum under the mortgage.  This objection fails as a matter of law. Under Massachusetts law, no consideration is required to effectuate a valid assignment of a promissory note and the mortgage securing it.  "[A]s between the assignee and the maker of the note, neither consideration nor notice to the maker was essential to an assignment."  *O'Gasapian v. Danielson*, 284 Mass. 27, 32 (1933), citing *Cosmopolitan Trust Co. v. Leonard Watch Co.*, 249 Mass. 14, 19 (1924) (as against maker of note, assignee need not show consideration; uncertainty as to consideration paid for assignment of note did not affect the validity of the assignment as none was required).

In the second, the Debtor contends that he has been prejudiced by the failure of Astrum and its successors in interest to timely and properly inform him as to changes in ownership of the note and mortgage and changes in payment obligations as to the note.  In support of this objection, however, the Debtor has submitted no evidence whatsoever.  Nor has he specified the time-periods at issue or the nature or extent of the prejudice he has allegedly suffered as a result. Accordingly, the Court concludes that the Debtor has not, with respect to this objection, rebutted the prima facie evidence of the claim itself.

The remaining three objections do not challenge the mortgage itself or the extent of the mortgage debt.  Rather, they dispute Portfolio's claim to ownership of the rights of the mortgagee thereunder.  First, the Debtor contends that he and his wife have no direct contractual relationship with Portfolio.  Rather, the original obligee on the note and mortgagee on the mortgage was Astrum funding.  Second, the Debtor contends that Astrum and its successors and

25

assigns have not adequately documented and recorded the chain of title with respect to the note
and mortgage, such that it is not clear whether Portfolio does in fact currently own Astrum's
rights under the note and mortgage.  Third, the Debtor contends that Portfolio overstates the
scope of Judge Kenner's ruling on Portfolio's mortgage in his earlier bankruptcy case.

In support of these objections, the Debtor has submitted no evidence, but Portfolio itself
has submitted evidence (both at the evidentiary hearing and with the proof of claim itself) on
which the Debtor can rely:  the note and mortgage given to Astrum, and the assignments from
Astrum to Union and then from Resolution GGF OY "as successor in interest to Union Mortgage
Company" to Portfolio.  These establish two things.  They first establish that the Debtor and his
wife gave the promissory note and mortgage in question to Astrum, not to Portfolio; Portfolio,
who maintains that it obtained Astrum's interests in the note and mortgage by assignment, does
not dispute this.  Second, and more importantly, they show that the chain of title from Astrum to
Portfolio includes two critical gaps.

Portfolio contends that it holds title by virtue of two assignments:  the first from Astrum
to Union Mortgage Company, and the second from Resolution GGF OY "as successor in interest
to Union Mortgage Company" to Portfolio.  The first assignment has been well established: the
assignment from Astrum to Union Mortgage Company, having been made and signed by Astrum
itself, appears to be valid and in order.  The second assignment, however, was not executed by
Union Mortgage Company, the assignee under the first mortgage.  Rather, it was executed by
"Foremost Servicing Company, Inc., by Power of Attorney for Resolution GGF OY, Successor
in Interest to Union Mortgage Company, Inc."  The assignment is effective only if (1) Resolution
GGF OY was in fact the successor in interest to Union Mortgage Company with respect to
ownership of the promissory note and mortgage and (2) Foremost Servicing Company, Inc. held

a valid power of attorney for Resolution GGF OY.  The assignment itself is not evidence that

either of these necessary conditions was satisfied when the assignment was executed.  Proof that

these conditions were satisfied requires evidence extraneous to the assignment.  Portfolio

submitted no such evidence either with the proof of claim or at the evidentiary hearing.[22]  Hence,

there are two critical gaps in the Portfolio's proof that it holds title.  In view of these gaps, I

conclude that the Debtor has rebutted the prima facie evidence of the proof of claim, that the

burden of proof was thereby shifted to Portfolio to prove that it is the holder by assignment of

the promissory note and mortgage, and that Portfolio has failed to carry this burden.  Portfolio

has failed to establish that it is the holder by assignment of the second mortgage.  The Debtor's

objection to the secured claim of Portfolio must therefore be sustained, the claim disallowed,

and, in accordance with 11 U.S.C. §506(d),[23] the mortgage declared void.

---

[22]Portfolio has invoked Judge Kenner's rulings in the earlier bankruptcy case.  Those rulings apparently concerned the chain of title to the Astrum mortgage.  However, Portfolio has not specified the findings, rulings, and orders in question.  Nor has it adduced evidence of such finding, rulings, and orders or asked the Court to take judicial notice thereof.  Nor has it moved in any fashion to establish any portion of the chain of title to the Astrum Mortgage by the preclusive effect of earlier findings, rulings, and orders.  Accordingly, the Court can give no preclusive effect in this proceeding to any findings, rulings, and orders from the earlier case; nor need the Court address the Debtor's contention that Portfolio overstates the scope of the earlier ruling.

[23]Section 506(d) states:

> To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--
>
> > (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or
> >
> > (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

11 U.S.C. § 506(d).  Portfolio's claim was not disallowed under § 502(b)(5) (for unmatured

### d.  **Chapter 13 Plan**

The Debtor's most recent plan makes no provision for the secured claim of Matrix and therefore cannot be confirmed.  Matrix holds a secured claim in the amount of $358,424.28 as of the date of the Debtor's bankruptcy filing, plus postpetition interest and costs, less postpetition payments (if any).  The arrearage on that claim, as of the date of the bankruptcy filing, was $264,122.10.  Monthly payments on the claim are in the amount of $2,610.28.

The Court has sustained the Debtor's objection to the claim of Portfolio.  Therefore, the Debtor's plan need not provide for the claim of Portfolio.


## Conclusion

By separate order, the Court will overrule the Debtor's objection to the claim of Matrix, disallow the secured claim of Portfolio, sustain the objection of Dovenmuehle (contrued as an objection by Matrix) to the Chapter 13 plan, and order the Debtor to file, by a date certain, an amended plan that makes provision for the allowed secured claim of Matrix.  The Court also again urges Mr. Long to obtain the assistance of counsel in this matter.


Date: <u>October 2, 2006</u>

*Robert Somma*
_____
Robert Somma
United States Bankruptcy Judge

cc:  Mr. James Long, Jr., Debtor
     Reneau Langoria, Esq., for Matrix and Dovenmuehle
     Richard Rogerson, Esq., for Portfolio Solutions
     Carolyn Bankowski, Esq, Chapter 13 Trustee

---

support obligations) or under §502(e) (concerning certain claims for reimbursement or contribution), so it is not subject to the exception in §506(d)(1).  And a proof of claim was filed as to this lien, thus taking it out of the operation of the exception in §506(d)(2).  Therefore, by operation of § 506(d) and as a consequence of the disallowance of Portfolio's secured claim, the lien being asserted by Portfolio as the basis of its secured claim is void.